IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 23, 2015 at Knoxville

**STATE OF TENNESSEE v. DAVID LEON GRAVES**

**Appeal from the Criminal Court for Wilson County**
**No. 13-CR-212     David E. Durham, Judge**

_____

**No. M2014-01547-CCA-R3-CD**

_____

The defendant, David Leon Graves, was convicted by a Wilson County Criminal Court jury of two counts of attempted first degree premeditated murder, a Class A felony; one count of assault, a Class B misdemeanor; and one count of reckless endangerment, a Class E felony.   He was sentenced by the trial court as a Range I, standard offender to twenty-five years and twenty years, respectively, for the attempted murder convictions, six months for the assault conviction, and two years for the reckless endangerment conviction.  The trial court ordered the twenty-year sentence served consecutively to the twenty-five-year sentence, for an effective term of forty-five years in the Department of Correction. The defendant raises six issues on appeal: (1) whether the evidence is sufficient to sustain the convictions; (2) whether the trial court erred by allowing evidence of statements the defendant made while hospitalized; (3) whether the trial court erred by admitting a photograph of the victim's injuries; (4) whether the trial court erred by not allowing evidence about a prior frivolous 9-1-1 call made by the defendant's girlfriend; (5) whether the defendant's convictions and sentences violate principles of double jeopardy; and (6) whether the trial court erred in ordering consecutive sentencing. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Comer L. Donnell, District Public Defender; Thomas H. Bilbrey (on appeal and at trial) and Joe McLerran (at trial), Assistant Public Defenders, for the appellant, David Leon Graves.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Tom P. Thompson, Jr., District Attorney General; and Javin R. Cripps, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

According to the State's proof at trial, early on the morning of December 5, 2011, the defendant's live-in girlfriend, Patricia Glover, called 9-1-1 to report that the defendant had struck and choked her as they argued over his possession of her 12 gauge shotgun, that he was suicidal, and that he had expressed his desire to die at the hands of responding police officers. When Deputy Dustin Cato and Sergeant Harold Cooley of the Trousdale County Sheriff's Department arrived at the home, Ms. Glover told them that she had taken the gun away from the defendant and hidden it in the house, where the defendant was with her two-year-old grandson. The deputies entered the home through the mudroom and began trying to get the defendant to come out. At one point, the defendant said, "I have my gun up, do you have yours up?" Shortly thereafter, Sergeant Cooley saw the defendant standing around a corner with the shotgun aimed at the officers and responded by firing his weapon and striking the defendant. Almost immediately, the defendant fired the shotgun, striking Sergeant Cooley in the face. The Trousdale County Grand Jury subsequently indicted the defendant with the attempted first degree premeditated murder of Sergeant Cooley, the attempted first degree premeditated murder of Deputy Cato, the aggravated domestic assault of Ms. Glover, and felony reckless endangerment.

## Suppression Hearing

Prior to trial, the defendant filed a motion to suppress incriminating statements he made while hospitalized, arguing that he was not given his Miranda warnings and was unable to appreciate or understand the consequences of his actions because he had just undergone surgery and was under the influence of pain medications. At the suppression hearing, Detective Chaney Wright of the Trousdale County Sheriff's Department testified that he and Detective Winette were assigned to sit with the defendant while he was hospitalized at Vanderbilt Medical Center. They arrived at the defendant's bedside in the trauma unit at approximately 3:00 p.m., with instructions not to speak to him but to get him a nurse if he needed any assistance. Shortly after their arrival, a nurse who did not work on the unit came into the room and told them that her son was a police officer and that she was sympathetic to the police. When she asked them how Sergeant Cooley was doing, the defendant said, "I hope the son of a b**** dies."

Detective Wright testified that the defendant was coherent, asking logical questions of his nurses, keeping track of when his next scheduled pain medication was due, and advising the nurses of his levels of pain and when he needed to urinate. He said

sometime after the 7:00 p.m. nurse shift change, the new nurse, Ashley Mallory, came in the room to check the defendant's IV. While she was there, the defendant asked him how Sergeant Cooley was doing. When he made no response, the defendant asked Nurse Mallory, who responded that she did not know because Sergeant Cooley was not her patient. The defendant then made the comment that he hoped "the mother f***er" died and that Sergeant Cooley had shot him first, "so [he] shot him back."

Detective Wright testified that it was obvious to him that the defendant was "trying to get under [their] skin." As an example, he described how the defendant at one point awoke from a nap, looked at him, smiled "real big," and winked. He said the defendant also asked him to hold his plastic urinal while he urinated, saying, "[I]sn't it your job to serve and protect?" Detective Wright testified that he never responded to any of the defendant's comments and never asked him any questions. On cross-examination, he acknowledged that the defendant had undergone surgery, was on pain medication, and expressed to the nurses that he was in pain. After having his memory refreshed by his report, he testified on redirect that the defendant said to Nurse Mallory that Sergeant Cooley had shot him first so he had shot back and "that he was trying to kill him and he hoped the mother f***er died."

Sergeant Joe Sullins of the Trousdale County Sheriff's Department testified that he followed the defendant's ambulance to Vanderbilt and remained with him in the trauma room from the time the defendant came up from the emergency room until Detectives Winette and Wright arrived to relieve him. The defendant tried to engage Sergeant Sullins in conversation two or three times, but he never acknowledged him. On one occasion, the defendant asked if he had been hunting and said that he had "went and killed a rabbit." The defendant also asked whether he carried a "2-2-3" and said that "all sergeants carry a 2-2-3." Sometime in the early afternoon, the defendant said that he hoped Sergeant Cooley died. About thirty minutes later, however, he said, "I didn't mean that."

On cross-examination, Sergeant Sullins testified that when he removed the defendant's handcuffs at the request of the paramedics at the shooting scene, the defendant reached out, asked to shake his hand, and said that he remembered him "from L.C.'s."

At the conclusion of the proof, the trial court found that there were no constitutional violations because no state or government action was involved and that the admissibility of the statements, therefore, depended on whether they were relevant to any issue at trial. Analyzing each statement in turn, the court concluded that the defendant's statements about hoping Sergeant Cooley died were relevant and admissible because they went to his *mens rea* for the crimes. The court concluded the defendant's having asked

Detective Wright to hold his urinal because it was his duty to serve and protect was similarly relevant as to the defendant's *mens rea*, due to the fact that the detective was a police officer, as was the shooting victim. The trial court concluded that the defendant's statements about hunting rabbits, the weapons deputies carry, and having remembered Sergeant Sullins were not relevant and therefore inadmissible. Finally, the court concluded that the defendant's statement that he did not "mean that," made shortly after his statement that he hoped Sergeant Cooley died, was relevant and admissible as part of his complete statement.

In the same pretrial hearing, the trial court considered the defendant's motion to exclude photographs of the victim's[1] injuries as unduly prejudicial. The trial court excluded a photograph of the victim's injuries taken after treatment by his physicians, but ruled that the State could introduce a black and white photograph taken immediately after the shooting because it was relevant to show the extent of the victim's injuries and the defendant's intent to commit the crime. The court further concluded that its probative value outweighed its prejudicial effect.

## Trial

Chief Deputy Wayland Cothron of the Trousdale County Sheriff's Department testified he was awakened just before 1:00 a.m. on December 5, 2011, by a phone call informing him that an officer had been shot. He immediately rushed to the scene, arriving at 1:08 a.m. to find Sergeant Cooley on his knees in the driveway at the rear of the house. Sergeant Cooley was holding his head and complaining of a terrible headache and being unable to see, and Chief Deputy Cothron observed "a deep, gaping wound" where his right eye should have been.

After Emergency Medical Services ("EMS") arrived and began working on Sergeant Cooley, Chief Deputy Cothron turned his attention to a corner of the yard closer to the house, where he observed the handcuffed, bloody defendant lying on the ground. A second EMS team began assessing and treating the defendant at the scene, and within ten minutes both Sergeant Cooley and the defendant were loaded into their respective ambulances to begin transport to Vanderbilt, with Sergeant Joe Sullins assigned to follow the defendant's ambulance. Chief Deputy Cothron said he assigned Detectives Winette and Wright to relieve Sergeant Sullins at the hospital after they completed their duties at the crime scene and had a chance to go home to get some sleep. He instructed all three officers not to speak to the defendant but to note any voluntary statements he made.

---

[1]Although there are four victims, for simplicity's sake we will refer to Sergeant Cooley as the victim.

Pam Stafford, a dispatcher for the Trousdale County Sheriff's Department, identified the recording of a 9-1-1 call she received from Patricia Glover at 12:45 a.m. on December 5, 2011, which was played for the jury and admitted into evidence. In the call, Ms. Glover stated that the defendant had a gun and some shells and was "wanting the cops to come so that they can kill him. He's wanting to die tonight." Ms. Glover also reported that the defendant was "going outside with it now to wait on [the police]." She said she and the defendant had been arguing over his possession of her 12 gauge shotgun and that he had "kicked [her] all over . . . the house and [had been] fighting [her] and cussing [sic] [her]." The defendant asked to speak to the dispatcher at one point, and when he got on the line, he informed Ms. Stafford that the gun was his because he had paid for it. He said he had wanted to leave the house with the gun, but it was "too late for that now" because "[t]he law pulled up," so he would just shoot himself.

Ms. Stafford testified that the first call cut off after she spoke with the defendant. When she called the number back, Ms. Glover informed her that she had taken the gun away from the defendant and unloaded it, that the police were on the scene, and that the officers had asked her to stay where she was while they spoke with the defendant.

Ms. Stafford testified that during the time she was on the 9-1-1 call with Ms. Glover and the defendant, she was also communicating with the responding officers, Deputy Dustin Cato and Sergeant Harold Cooley, and relaying to them the information she had learned from Ms. Glover, including that it was a domestic dispute involving a 12 gauge shotgun and that the defendant was possibly suicidal. According to her records, the officers arrived on scene at 12:49 a.m. and shots were reported fired at 12:55 a.m. On cross and re-cross examination, she acknowledged that the defendant was agitated and upset during his conversation with her and that there was no indication that he was threatening to shoot anyone other than himself.

Tennessee Bureau of Investigation ("TBI") Special Agent Criminal Investigator Joshua Savley identified a number of photographs and items that were introduced as trial exhibits, including a diagram he had prepared of the scene; the 12 gauge shotgun, which was found with the hammer cocked and a live shell inside; a box of unused shotgun shells found on top of the chest of drawers in the bedroom; a spent shotgun shell found in a burn pit outside; Sergeant Cooley's AR15 rifle; and a spent .223 shell casing found in the kitchen. On cross-examination, he testified that the .223 round had been fired from the AR15 assault rifle.

TBI Special Agent Forensic Scientist Teri Arney, an expert in firearms identification, testified that the box of shotgun shells found in the bedroom were Winchester brand, Number 7 shot, which was the same as the live round found in the shotgun and the spent shell found outside. Her examination of the shotgun revealed that

5

it was in working order, with all safety features operational.  She explained that the safety features were designed to prevent the weapon from firing unless the hammer was cocked and the trigger fully pulled all the way to the rear:

> It has a transfer bar that is located in this area, and basically what the transfer bar is designed to do is transfer the energy of the hammer falling to the firing pin.  It is only in the correct position to do that when the trigger is pulled fully to the rear.  In other words, if you were to just cock the hammer and accidentally turn it loose and it were to fall, without the trigger being pulled fully to the rear, the gun is not supposed to fire because the transfer bar is not in the correct position.

Agent Arney testified that there were no recalls on the weapon.  On cross-examination, she testified that a bullet fired from an XM15 rifle travels at a velocity of "about three thousand feet per second," while the type of shotgun shell involved in the case travels at a velocity of 1300 feet per second.

Dr. Wesley Thayer, the Vanderbilt plastic surgeon who was on call the night that Sergeant Cooley was brought into the emergency room, testified that he met the critically-wounded gunshot victim, who was intubated and had "massive soft tissue damage," in the operating room.  Using a black and white photograph to illustrate his testimony, Dr. Thayer described the specific damage caused by the shotgun pellets, testifying that the ballistic injury "carved off soft tissue and cartilage from the nose," displaced the cheek bone, and proceeded through "the middle and lateral aspect of his right eye . . . taking out segments of bone and soft tissue and the eye itself."  Dr. Thayer testified that during his first surgery on the victim, he debrided, or removed, "devitalized tissue" and "closed some of the soft tissue defect" in the cheek region.  During the second surgery, which occurred four or five days later, he used a rib graft to reconstruct the bottom and outer aspect of the eye socket.  During the third surgery, which took place in July, he revised the "very noticeable" surgical scar on the victim's cheek and debrided necrotic tissue in his eye region that had been causing a draining wound.

Dr. Thayer identified an x-ray of the victim's face showing his facial reconstruction with the bone graft, screws and plates and the multiple shotgun pellets that remained "lodged deep into tissues" on the right side of his face after his surgeries.  He said the victim was left without an eye, with a droop to his right brow caused by the fact that those nerves had been "blasted away," with pain whenever he bit down to eat on the right side of his mouth, with a scar deformity, and with chronic, debilitating headaches.

Amanda Medlin, a "care partner" or nurse assistant in the trauma unit of Vanderbilt Hospital, testified that she was at the defendant's bedside in the trauma unit

around lunchtime on December 5, 2011, when the defendant, who was very irate, asked her, "[D]id I kill that son of a b****[?]" Later in the afternoon, she went back to his bedside, and he said, "I hope I killed that mother f***er." Ms. Medlin testified that the defendant repeated the statements at least three times that she could recall. She stated that the defendant had an incision on his abdomen from exploratory surgery that was performed to see if there were any bullet fragments in his abdomen. To her knowledge, however, he was shot in the face, not the abdomen. On cross-examination, she identified photographs of the defendant taken at the hospital which showed a gash on his left cheek where the bullet entered, the exit wound on his shoulder, and the bandage over his stomach covering the surgical incision.

Pamela Glover testified that in December 2011 she was living in a house on Coker Lane in Hartsville with the defendant and her then two-year-old grandson, whom she had been raising as her son. On the night of the incident, she had put her grandson to bed in a toddler bed beside her and the defendant's bed in a bedroom off the kitchen. She and the defendant were in the kitchen, and the defendant was sitting at the table texting on his cell phone and drinking tequila with her 12 gauge shotgun "cocked open" across his lap. She suggested that they place the shotgun on the kitchen counter for safety, and the defendant agreed. However, when she later went to get the gun to put it away, the defendant became upset and began fighting her for possession of the weapon, knocking her down, choking her, and ultimately wresting the gun from her by bending her finger backwards.

Ms. Glover testified that the defendant went outside with the gun, saying that he was going to "be with his [deceased] mama." She followed him outside and called 9-1-1 and related to the dispatcher what was happening. The defendant asked to speak to the dispatcher, and Ms. Glover overheard him say to tell his boy that he loved him. Ms. Glover said that the sirens of the approaching police cars were audible when the defendant finally gave the gun to her, along with a shotgun shell. She stated that she put the shell in her pocket and hid the gun underneath the dresser in their bedroom, where her grandson was sleeping, and then went back outside to greet the officers. The defendant was inside the house when the officers arrived, and she informed them of having placed the gun under her dresser. She also told the officers several times that her grandson was in the house and that she was concerned for his safety.

Ms. Glover testified that she heard the officers announce themselves to the defendant and tell him to put down his weapon and come out. A very short time later, she heard two gunshots "back to back." She began running toward the house, looked in, and saw Sergeant Cooley fall back on his buttocks. Deputy Cato told Sergeant Cooley to get up and move back before finally grabbing him by the collar and dragging him out of the house. Both she and Deputy Cato told the defendant to throw his gun out, and he

7

fairly quickly complied and came outside, where he was handcuffed and laid on the ground. On cross-examination, Ms. Glover acknowledged that the defendant never said anything about wanting to kill anyone other than himself.

Deputy Dustin Cato identified the CD of his dashboard videotape of the incident, which was played for the jury and admitted as an exhibit. He testified that when he and Sergeant Cooley first arrived at the home they spoke for less than a minute with Ms. Glover, who related her concerns about the child being in the house with the defendant and the gun, before they approached the back door. Sergeant Cooley announced who they were before entering into the mud room, with Deputy Cato immediately behind him. Both of them were carrying their weapons in the "low ready" position. Sergeant Cooley asked the defendant where he was, and the defendant replied, "I'm back here."

Deputy Cato testified that the defendant then said, "I have my gun up, do you have yours up[?]" He said Sergeant Cooley told the defendant multiple times to put the gun down and that he did not want the child to see what was going on. The defendant replied that the child was right there and was all right. Deputy Cato then saw Sergeant Cooley position himself as if ready to take a shot, heard him rapidly say, "[D]rop your weapon, drop your weapon," heard two shots in rapid succession, and saw Sergeant Cooley fall.

Deputy Cato testified that he asked Sergeant Cooley if he had been shot before he saw that there was "flesh hanging off of his head." At that point, he grabbed Sergeant Cooley by the collar of his vest and dragged him outside to the back corner of the house. As he was dragging him out, Sergeant Cooley got on the radio and announced shots fired. Approximately a minute later, the defendant threw his weapon out the door at Deputy Cato and Ms. Glover's request and walked out the door with his left hand in his pocket. Deputy Cato told the defendant to get his hands up and walk toward him. As the defendant was doing so, he walked past Sergeant Cooley, who stood up and placed handcuffs on him before going back down onto the ground. Deputy Cato testified that he found four shotgun shells in a ziplock bag, a pocketknife, and a bag of chewing tobacco in the defendant's pockets. He did not smell any alcohol on the defendant.

On cross-examination, Deputy Cato acknowledged that Sergeant Cooley fired first but denied that he fired two shots, testifying that he had changed his mind since his preliminary hearing testimony after listening to the recordings from his car and hearing only two shots. He conceded, however, that it was possible that Sergeant Cooley fired a second shot simultaneously with the defendant's shot. Finally, he disagreed that the defendant never threatened to kill anyone other than himself, testifying that he considered his words, "I have my gun up," as a threat.

8

TBI Agent Joshua Savley, recalled by the State, testified that he interviewed Sergeant Cooley at the hospital on December 8. Sergeant Cooley was unable to speak at that time but, at Agent Savley's request, drew a diagram of the shooting scene showing where he and the defendant had been standing at the time of the shooting. Agent Savley said that the distance between their respective positions -- the door frame of the door leading from the mudroom to the kitchen and the door frame of the door leading from the kitchen to the bedroom -- was nine feet, two inches. On cross-examination, he testified that DNA analysis of the blood evidence found at the scene supported Sergeant Cooley's account of where the shooting occurred. He further testified that he collected only one spent .223 round and no spent shotgun shells inside the house.

Detective Chaney Wright of the Trousdale County Sheriff's Department essentially reiterated the portion of his testimony from the suppression hearing that the trial court had ruled admissible.

Sergeant Harold Cooley testified that he was the supervising officer on duty the night of the shooting and was beside Deputy Cato, a relatively new officer at the time, when Deputy Cato was dispatched to the "domestic assault in progress with a weapon call." He said that domestic assault calls are very dangerous and that he and Deputy Cato both responded to the scene. The first to arrive, he parked in front of the house, "secured" his rifle, and almost immediately came in contact with Ms. Glover, who informed him that the defendant was inside the house with the child and that she had hidden the guns.

Sergeant Cooley testified that he and Deputy Cato announced their presence and entered the house through the mudroom, where they remained throughout the incident. He said they could hear some commotion in a room to the right but did not know what type of room it was. Shortly thereafter, the defendant appeared in the doorway and Sergeant Cooley began trying to talk him into coming out. He introduced himself to the defendant, and the defendant replied that he knew who he was and where he lived. He saw the stock of a gun through the corner of the door as he and the defendant exchanged more conversation, which he could not specifically recall, until the defendant said, "[C]ome in here and do what you came to do."

Sergeant Cooley testified that he continued trying to reason with the defendant. He recalled that he told the defendant that his child did not need to see this and that the defendant replied that his child was "right here." One of the last things he remembered hearing the defendant say was, "I've got my gun up, do you have your gun up[?]" At that point, Sergeant Cooley took his rifle "from a low ready position up on point and fired [his] shot because [he] was looking down the barrel of a shotgun." He fired first, he said, because the defendant was pointing his shotgun directly at him.

9

After firing his round, he felt something hard hit him and immediately fell backwards onto his buttocks in the mudroom. He was initially stunned, but as Deputy Cato was dragging him out of the house he realized what was happening, pulled his radio off his hip, and radioed to dispatch that shots had been fired. Deputy Cato dragged him down the driveway and brought him to rest at the back side of a truck. He next heard Deputy Cato shouting and saw the defendant walking in his direction. When the defendant reached him, he noted that he was unarmed, jumped to his feet, tackled and handcuffed him, and instructed Deputy Cato to keep him under control. Deputy Spears arrived on scene a few moments later, and he instructed him to take control of the scene and to call the chief deputy. Sergeant Cooley testified that he did not start to panic until Chief Cothron arrived on scene, walked up to him, and said, "[G]ood, God, help him."

On cross-examination, Sergeant Cooley testified that he was not certain how many rounds were in his magazine prior to the shooting because he had loaned the rifle to a fellow officer to qualify with the weapon. He said he had reloaded the weapon with the rounds that were available but did not have a complete round count. He was certain, however, that he fired only one round that night.

The defendant, testifying in his own defense, acknowledged he had several felony and misdemeanor convictions before he provided the following version of the incident. On the afternoon before the shooting, he and Ms. Glover took the shotgun and a ziplock bag with four shells in it to her mother and stepfather's home so that he could try to kill an opossum that had been getting under their trailer. On their way home, he saw some deer in a field that belonged to the father of the county executive, began "spotlighting" them, and got out of his truck to shoot one. The only ammunition he had, however, was the bird shot with which the gun was loaded and that he had carried with him in the ziplock bag. At about that time, a man drove up. Not wanting to be caught with the gun, he threw it down in the mud. When the man left, he picked up the gun, went home, and sat down at the kitchen table to clean the weapon. Ms. Glover's grandson kept trying to reach the weapon, so he took him outside and fired the shotgun next to him, hoping that the loud noise would make him frightened of the gun. He ejected the shotgun shell outside, where it flew into the burn pit.

He then went back inside, put the child to bed, and returned to the kitchen, where Ms. Glover started arguing with him about the way he had tried to teach the child to respect firearms and the fact that he had run into an ex-girlfriend in town the previous night. During that time, he was sitting at the table with the shotgun "broke down" in preparation for cleaning as he listened to music, drank tequila and beer, and exchanged threatening texts with his ex-girlfriend's son. He tried to ignore Ms. Glover, but she

10

would not let up on him. He "started getting madder and raging" until he finally told her to "shut up" and that she "ma[d]e somebody just want to blow their brains out."

At that point, Ms. Glover grabbed the shotgun from the table, knocking over his tequila bottle. He jumped up to try to save his liquor, and they then started fighting over the gun. He finally grabbed it from her, and, in the process, she slipped on a quilt and fell onto the floor. He laid the gun down and went to retrieve some of his clothes from the bedroom with the intention of leaving the house. She picked up the gun again, and he left the house. She followed him with the gun and her cell phone, and he overheard her telling the 9-1-1 dispatcher that he had hit or choked her. He pressed on her chest, took the gun from her a second time, and continued walking around the house. He could hear her still on the phone with the 9-1-1 dispatcher so he turned around, snatched the phone from her, and talked to the dispatcher himself, telling her that all he wanted to do was to leave the house with his belongings. He was angry at Ms. Glover for lying to the dispatcher and for the "bogus calls" she had made about him to 9-1-1. About a month earlier, she had called 9-1-1 to complain that he would not sleep with her. Police officers responded to the home at that time, but no charges were ever brought against him.

On the night of the shooting, he was "in a suicidal state of mind" and wanted to die. He leaned the gun against the truck while speaking to the dispatcher, and Ms. Glover grabbed it again. He chased her and grabbed the gun from her a third time. To his knowledge, the gun was still unloaded. He never heard any sirens or saw any lights and was unaware of the approach of the police vehicles. He went back inside the house and tried to use a cell phone in the kitchen, but it had no service. He did not load the gun, and Ms. Glover never took it from him again.

He saw that the bathroom and bedroom lights, which were controlled by a single switch located in the kitchen, were on. Because Ms. Glover's grandson, whom he thought of as his own son, was asleep in the bedroom, he cut off the light switch. He never went into the bedroom and was still standing in the kitchen when he heard the screen door open and turned to see Sergeant Cooley in the doorway with his gun pointed at him. He immediately "stuck [his] gun up above [his] head" and told Sergeant Cooley that he had his gun up.

Sergeant Cooley kept screaming at him to throw his gun down, and he now realized that he should have complied, but at the time he was in an intense and stressful situation and unable to think clearly. He was still trying to explain the situation to Sergeant Cooley when he saw Sergeant Cooley's head tilt over as if he were "sighting down" his weapon. Anticipating that he was about to get shot, he turned and "tense[d] up," at the same time dropping his arms with the shotgun. He felt himself get struck in the face, causing his head to "whip around," brought his head back, felt a "pinch" in his

neck, and saw his muzzle flash as his shotgun accidentally discharged. Afterwards, he walked into the bedroom to check on his son, ejected his shotgun shell, and reloaded the gun. He then walked back to the kitchen, opened the door to the mudroom, saw the blood, and realized that he had hit Sergeant Cooley. Ms. Glover and Deputy Cato were yelling at him to throw his gun outside, which he did, and then he walked out the door.

The defendant described his injuries and the surgery he underwent at Vanderbilt. He acknowledged having said that he hoped Sergeant Cooley died because he had shot him first and explained that he was angry because the officers would not respond to him when he asked them how Sergeant Cooley was doing. On cross-examination, he denied having asked Sergeant Cooley whether he had his gun up. He insisted that he did not see or hear the police coming and that he never went into the bedroom or bathroom before the shots were fired. He testified that at the time he was shot and the gun discharged, he was holding the weapon in his usual manner with his "finger just around the trigger, and [his] thumb around the hammer." He said he did not know that the weapon was cocked or that Deputy Cato was inside the house. He stated that he remembered being hit twice.

TBI Agent Joshua Savley, called as a rebuttal witness by the State, testified that he interviewed the defendant at Vanderbilt Hospital on Tuesday, December 6, 2011, at approximately 1:50 p.m. He read aloud from the narrative he had prepared of the interview, including the following account of the incident provided by the defendant:

In the late evening hours of December 4, 2011 and early morning hours of December 5, 2011, my girlfriend, Patricia Glover, and I were in an argument. The argument got to the point where she asked me to leave. I was preparing to leave with my phone and shotgun when she tried to stop me from taking my stuff. We wrestled over my stuff for a minute. Patricia then called the police. While Patricia was on the phone with the police, I grabbed the phone from her and talked to them as well. I told them I was ready to go see my mother who was dead. I told them if the police came I was going to start shooting. A few minutes later I saw lights coming up the driveway. They did not have lights and sirens on but I figured it was the police because Patricia had just called the law. Patricia took the gun, unloaded it, put it in the bedroom and told me to wait inside. She said she was going to talk to the police and tell them everything was okay now. I then went to the bedroom and shut the door to hide the gun so that the police didn't see me with a gun. The next thing I heard was an officer that said, Sheriff's Department, come out, we have you surrounded. I opened the bedroom door with the gun in my hands and saw Dustin Cato in the kitchen window. Dustin used to be a jailer and he and I had some differences before in the jail. He became a cop earlier this year. He is still

12

in his rookie year. I could also see one cop standing at the door to the kitchen. He said his name was Cooley and I recognized him. He has been a cop for forever around here. He lives down the street from me and has two kids. I told him he was a good cop. I talked to him about wanting to die. I told him I wanted to kill myself and go home to see my mama. At some point, I realized the gun was still loaded. I told Cooley I was putting the gun down and stuck the gun out the door of the bedroom. I told him my kid was in the room with me. Then all of a sudden I got shot. I don't know if I was shot in the stomach or the face. I shot back at Cooley. At first, I didn't realize I was hit until I saw blood on the floor. After I shot, I threw the gun down. I did not reload it. The cops got out of the house after the shooting. I went to the back door and threw the shotgun out in to the yard and then came outside. I saw Cato and he was telling me to come to him. I saw Cooley on the ground with blood all over his face. Someone then shot me again. They put me on the ground and put me in cuffs.

On cross-examination, Agent Savley testified that the defendant had just undergone surgery and was on pain medication at the time of the interview. He acknowledged that the narrative he prepared was his summary of the interview rather than a verbatim account of the defendant's words.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant's first five issues all relate to the sufficiency of the evidence for his attempted first degree premeditated murder convictions. Specifically, he argues that the evidence fails to show premeditation. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and

resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In cases where the defendant has been charged with the attempted commission of a crime, there must be evidence that the defendant acted "with the kind of culpability otherwise required for the offense" and acted "with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a), (a)(2) (2014). First degree murder is defined as "[a] premeditated and intentional killing of another." Id. § 39-13-202(a)(1). "Premeditation" is

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

The "element of premeditation is a question of fact" for the jury to determine based upon a consideration of all the evidence. State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)). "[P]remeditation may be established by any evidence from which a rational trier of fact may infer that the

14

killing was done 'after the exercise of reflection and judgment' as required by Tennessee Code Annotated section 39-13-202(d)." State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003). A jury may infer premeditation from circumstantial evidence surrounding the crime. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). There are several factors which our courts have concluded may be evidence of premeditation: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." Bland, 958 S.W.2d at 660. An additional factor from which a jury may infer premeditation is evidence establishing a motive for the killing. See State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).

The defendant argues that the evidence is insufficient to show that he was sufficiently free from passion and excitement to be able to form premeditation. In support, he cites evidence that he had been drinking and arguing with his girlfriend and was in an agitated, suicidal state of mind at the time of the shooting. He also cites the firearms expert's testimony about the relative velocities of the AR15 bullet and the shotgun pellets to argue that "the proof shows that Defendant's shotgun was discharged when the rifle bullet, fired by Sgt. Cooley, struck him, causing the shotgun to discharge and hit Sgt. Cooley."

We conclude, however, that the evidence was sufficient for the jury to find that the defendant acted with premeditation and the intent to kill when he fired his shotgun at the officers. When viewed in the light most favorable to the State, the proof establishes that the defendant found and loaded the shotgun, turned off the lights in the bedroom and bathroom, and waited in the dark as the officers entered the home. Instead of surrendering his weapon and coming out or retreating to shoot himself, the defendant made a threatening statement to the officers and aimed his shotgun directly at Sergeant Cooley, who was standing in the mudroom with Deputy Cato behind him. When Sergeant Cooley shot him, the defendant fired back, striking Sergeant Cooley in the head. He then ejected the shotgun shell and reloaded the weapon before he finally decided to give up and throw the shotgun out the door. At the hospital, the defendant made a number of unsolicited incriminating comments, including how he hoped Sergeant Cooley died, how he had shot Sergeant Cooley because Sergeant Cooley shot him first, and how he had been trying to kill him. Finally, the shotgun was in good working order, with all its safety features operational. In addition, the defendant made no claims of the weapon's having accidentally discharged when he was interviewed by Agent Savley immediately after the shooting. We conclude, therefore, that the evidence is sufficient to sustain the defendant's convictions for the attempted premeditated murders of Sergeant Cooley and Deputy Cato.

15

## II. Admission of Defendant's Hospital Statements

The defendant next contends that the trial court erred by allowing witnesses to testify about the incriminating statements he made in the hospital. In essence, he argues that the trial court erred in finding that the statements, made after the shooting while he was recovering from surgery, in pain, and under the influence of medication, were relevant to show premeditation or that their substantive value outweighed their prejudicial effect.

When this court reviews a trial court's ruling on a motion to suppress, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence, subject to certain exceptions, is generally admissible under Rule 402 of the Tennessee Rules of Evidence. Relevant evidence may be excluded, however, if "its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403.

The trial court found that the defendant's statements about hoping that "the mother f***er" died and having shot and tried to kill Sergeant Cooley because Sergeant Cooley shot him first were relevant to show the defendant's premeditation and intent. We agree. We also agree that the probative value of the evidence outweighed its prejudicial effect. The jury heard about the defendant's condition at the time the statements were made and could, therefore, give the statements whatever weight it deemed appropriate. We conclude, therefore, that the trial court properly admitted the statements.

### III. Admission of Photograph

The defendant next contends that the trial court erred by allowing the State to introduce the black and white photograph of the victim's injuries, arguing that the photograph was unduly prejudicial, gruesome, and inflammatory in nature and that the medical testimony of Dr. Thayer, alone, was sufficient to adequately describe the injuries.

The admissibility of photographs generally lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing that the trial court abused its discretion. State v. Faulkner, 154 S.W.3d 48, 67 (Tenn. 2005); State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000). In determining whether a photograph is admissible, the trial court must first determine whether it is relevant to a matter at issue in the case. See Tenn. R. Evid. 401; State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998); Banks, 564 S.W.2d at 949. The court must next consider whether the probative value of the photograph is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403.

The photograph at issue was relevant to show the nature of the injuries to the victim's head and face, to supplement Dr. Thayer's sometimes arcane medical testimony, and to support the State's argument that the defendant acted intentionally and with premeditation when he fired the shotgun. In our view, the photograph was rendered even more relevant by the defendant's description of his ammunition as "birdshot," insufficient for taking down a deer. Without the visible evidence of the wounds depicted by the photograph, a juror unfamiliar with firearms or the type of damage possible from a close range shotgun blast might well have concluded that the defendant, having loaded his weapon with "birdshot," could not have intended to kill when firing his weapon at the officers. Moreover, the photograph, while certainly unpleasant, is not unduly gruesome. As such, we cannot conclude that its probative value was substantially outweighed by the danger of unfair prejudice or that the trial court abused its discretion in admitting it into evidence.

### IV. Disallowance of Evidence of Prior 9-1-1 Call

The defendant next contends that the trial court erred by not allowing him to impeach the credibility of Ms. Glover with evidence of her prior, frivolous 9-1-1 calls. During cross-examination, defense counsel began questioning Ms. Glover about a 9-1-1 call she made about the defendant on October 28, 2011. When the State objected, defense counsel argued that the evidence was relevant to show that she "had a tendency

to call 911 for frivolous reasons." The trial court sustained the objection but allowed defense counsel to make an offer of proof.

During that offer of proof, Ms. Glover testified that she had called 9-1-1 on the night of October 28, 2011, because she and the defendant had gotten into an argument and she wanted him to leave. She denied that she asked the responding officers, "[W]hat kind of soon to be husband and father figure don't sleep with their wife?" or that she told the defendant that the next time she called the police, she would fabricate a story about his having hit her.

After the State rested its case-in-chief, defense counsel requested to call Detective David Winette to testify about Ms. Glover's prior 9-1-1 call. The trial court again sustained the State's objection and allowed the defendant to make an offer of proof. Detective Winette then testified about an incident report that reflected that Ms. Glover called 9-1-1 on October 28, 2011, and complained to the responding officers that the defendant would not sleep with her. The defendant told the officers that he wanted to sleep on the couch, and both the defendant and Ms. Glover reported to the officers that there were no other problems. Detective Winette testified that no arrests were made in the case.

The defendant argues that the trial court's disallowance of the above testimony was error because it "denied [him] the right to put in question the credibility of Patricia Glover." We agree with the State, however, that the trial court properly disallowed the testimony on the grounds that it was irrelevant to the issues at trial. We also agree that the defendant was able to impeach Ms. Glover's credibility with the prior 9-1-1 call by being allowed to bring up the incident during his own testimony. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

## V. Double Jeopardy

The defendant contends that his dual convictions and sentences for attempted first degree premeditated murder violate principles of double jeopardy because they are based on the same act. The State responds that the convictions do not violate the prohibition against double jeopardy because they involve two different victims. We agree with the State.

The Double Jeopardy Clause of the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V. Article I, section 10 of the Tennessee Constitution similarly provides "[t]hat no person shall, for the same offence, be twice put in jeopardy of life or limb." Our supreme court has recognized that the Double Jeopardy Clause

18

provides three separate protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense. State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012). This case involves the last of these three categories.

"In single prosecutions, multiple punishment claims ordinarily fall into one of two categories, . . . referred to as 'unit-of-prosecution' and 'multiple description' claims." Id. at 543. "[M]ultiple description claims arise when a defendant who has been convicted of multiple criminal offenses under *different* statutes alleges that the statutes punish the same offense." State v. Smith, 436 S.W.3d 751, 766 (Tenn. 2014) (citing Watkins, 362 S.W.3d at 544). By contrast, unit-of-prosecution claims arise "when defendants who have been convicted of multiple violations of the same statute assert that the multiple convictions are for the 'same offense.'" Watkins, 362 S.W.3d at 543.

In Watkins, the Tennessee Supreme Court abandoned the State v. Denton, 938 S.W.2d 373 (Tenn. 1996), four-factor test previously employed by Tennessee courts in determining whether dual convictions violate the prohibition against double jeopardy. Instead, for multiple description claims, the court adopted the same elements test enunciated by the United States Supreme Court in Blockburger v. United States, 284 U.S. 299, 304 (1932). Watkins, 362 S.W.3d at 556. Under the Blockburger test, the first step is to determine whether the convictions arise from the same act or transaction. Watkins, 362 S.W.3d at 545. If the convictions arose from the same act or transaction, the court must then determine whether the legislature intended to allow the offenses to be punished separately. Id. at 556. When the legislature has not clearly expressed its intent either to prevent or to preclude the dual convictions, the court must examine the statutes to determine whether the crimes constitute the same offense. Id. at 557.

Courts do not, however, "[g]enerally . . . apply the Blockburger test when addressing a unit-of-prosecution claim." Smith, 436 S.W.3d at 768 (citing Watkins, 362 S.W.3d at 543). Instead, the relevant analysis involves determining what the legislature intended to be a single unit of conduct for purposes of a single conviction and punishment. Id. (citing Watkins, 362 S.W.3d at 543). Courts are to "apply the 'rule of lenity' when resolving unit-of-prosecution claims, meaning that any ambiguity in defining the unit of conduct for prosecution is resolved against the conclusion that the legislature intended to authorize multiple units of prosecution." Watkins, 362 S.W.3d at 543 (citing Gore v. United States, 357 U.S. 386, 391-92 (1958)).

In State v. Goins, 705 S.W.2d 648, 651 (Tenn. 1986), our supreme court concluded that, "generally, if a criminal episode involves several victims who have personally been victimized, the evidence could sustain multiple convictions." Id. (citing

State v. Irvin, 603 S.W.2d 121 (Tenn. 1980) ("It seems illogical to us, as a general proposition, to hold that when two persons have been killed by an accused, he has committed only one homicide. Prior cases in this state so holding are overruled or modified to the extent that they conflict herewith."); see also State v. Jason D. Pillow, No. M2002-01864-CCA-R3-CD, 2004 WL 367747, at *13 (Tenn. Crim. App. Feb. 27, 2004), perm. app. denied (Tenn. June 21, 2004) (noting that "offenses with different named victims would not be the same for double jeopardy purposes").

The defendant was convicted of an attempt to commit the first degree premeditated murder of Sergeant Cooley and of an attempt to commit the first degree premeditated murder of Deputy Cato. Although there was a single act involved, there were two named victims, both of whom were in the same small mudroom in which the defendant fired his close-range shotgun blast. We conclude, therefore, that the defendant's convictions and sentences do not violate the prohibition against double jeopardy.

## VI. Consecutive Sentences

Finally, the defendant contends that the trial court abused its discretion in ordering that the two sentences for attempted first degree murder be served consecutively. Because he has combined his argument on this issue with his argument that the dual punishments violate principles of double jeopardy, the State argues that he has waived the issue for his failure to cite any legal authority on sentencing. The State further argues that the defendant has not overcome the presumption that his sentence is reasonable. We agree with the State.

The trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that any one or more of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) apply, including the two the trial court found applicable in this case -- that the defendant was an offender whose record of criminal activity was extensive and that the defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. Tenn. Code Ann. § 40-35-115(b)(2), (4).

When the court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense committed. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995). Our standard of review for a trial court's order of consecutive

sentencing is abuse of discretion with a presumption of reasonableness.  State v. Pollard, 432 S.W.3d 851, 859-60 (Tenn. 2013).

Although the trial court did not explicitly make the additional Wilkerson findings, they were implicit in its ruling.  Furthermore, the additional factor found applicable by the trial court, that the defendant was an offender whose record of criminal activity was extensive, is supported by the record.  Accordingly, we find no abuse of discretion in the consecutive sentencing imposed by the trial court.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE